UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA      )
                                )    No. 19-cr-00378
     v.                  )
                                )    Judge Edmond E. Chang
TYSHAWN SWINNEY          )
                                )

**MEMORANDUM OPINION AND ORDER**

In November 2018, Tyshawn Swinney was found with a gun in his pocket by Chicago Police Officers. R. 19.[1] He was charged as a felon in possession of a firearm under 18 U.S.C. § 922(g). Swinney now argues that the police search, which was based on an anonymous tip, violated his Fourth Amendment right against unreasonable searches. So, Swinney has moved to suppress the gun and the statements he made after the arrest. R. 29, Mot. Suppress. For the reasons explained below, the motion to suppress is denied.

## I. Background

For purposes of deciding the suppression motion, the facts narrated here are undisputed. In November 2018, Tyshawn Swinney walked into Aida Liquor Store on the south side of Chicago. R. 29, Mot. Suppress, Exh. A, Arrest Report at 3. Little did he know, at that exact moment, someone was describing what he was doing to a 911 operator. R. 30, Gov't Resp. Br., Exh. 1, 911 Recording. The anonymous caller reported that she was at the Bank of America at 79th Street and Halsted and saw a

---

[1]Citations to the record are noted as "R." followed by the docket number, and when necessary, the page or paragraph number.

man pull a "huge" silver gun out of his right pocket. 911 Recording at 0:11-0:14, 0:23-0:27. According to the caller, the man was standing on the street corner and was wearing blue jeans, white gym shoes, a black skull cap, and a dark black coat with fur around the collar.[2] *Id*. at 0:54-1:03. The caller explained that she was "watching him" and narrated how he was "coming up the corner where JJ's Fish is," and then how he was "walking now across the street towards the liquor store." *Id*. at 0:40-0:44, 0:50-0:53. The caller said that the man "scared the shit out of" her[3] when he pulled the gun out of his pocket. *Id*. at 0:44-0:48. She then repeated that he was "walking over towards the liquor store," with his hand "in his right pocket to his coat with a gun in it." *Id*. at 1:03-1:09. As the 911 operator asked a few follow-up questions, the caller became more animated, this time exclaiming that the man "just walked into the liquor store. He walked into Aida. A-I-D-A Liquors. He just walked in there. A-I-D-A Liquors. … Okay yeah he just walked in there. He's got a big gun on him." *Id*. at 1:16-1:30. In total, the call lasted around a minute and a half. *Id*. There is no dispute that the call was recorded and that the caller's cell phone number was captured by the 911 system.

After the 911 call was placed, the following message was relayed over the police radio-dispatch system to officers:

> 7900 South on Halsted, a male black, black skullcap, black coat with fur just pulled a large gun out from his pocket. They said that he just walked into the AIDA liquor store, 7900 South on Halsted. The person with a gun …. No

---

[2]The caller initially stated that the coat was dark blue, but later changed the color to black. The 911 operator pointed out the discrepancy, and the caller explained that she had meant black. *See* 911 Recording at 1:08-1:12.

[3]From the context of the call, it is clear that the caller was *not* reporting that Swinney had brandished the gun *at* her, only that she had seen him take the gun out.

number on the callback, no number on the callback. Described as a male black, black skullcap, black coat with fur, and that's all we have.

R. 29, Gov't Resp. Br., Exh. 2, Dispatch Recording.

A few minutes after the radio dispatch, several Chicago Police Officers responded to the call and showed up at the liquor store. Arrest Report at 3. The officers entered through the front door and walked past at least three other customers before spotting Swinney standing in line at the front register. R. 30, Gov't Resp. Br., Exh. 3, Gaines Body Camera Recording at 0:53-1:07; R. 30, Gov't Resp. Br., Exh. 5, Troupe Body Camera Recording at 2:10-2:22. Swinney was wearing a black coat with a fur-trimmed hood, a black skull cap, blue jeans, and white sneakers. Gaines Body Camera Recording at 1:07; Troupe Body Camera Recording at 2:23. As a result, the officers asked Swinney to step out of the line. Arrest Report at 3. The officers told Swinney about the 911 call they had received and explained that they were going to conduct a pat down search of him. *Id.* Swinney complied. *Id.* One of the officers felt a "hard object" in Swinney's right coat pocket, which the officer believed was a gun. *Id.* The object did turn out to be a gun, and Swinney was arrested. *Id.* After the arrest, Swinney admitted that he carried the gun for protection. *Id.*

## II. Analysis

"Under the Fourth Amendment, an officer cannot stop someone to investigate potential wrongdoing without reasonable suspicion that 'criminal activity may be afoot.'" *United States v. Watson*, 900 F.3d 892, 894 (7th Cir. 2018) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion is assessed in light of the totality of the circumstances and whether the officer has a particularized and objective basis

3

for suspecting criminal activity. *Watson*, 900 F.3d 894-95 (cleaned up).[4] Reasonable

suspicion is a "less demanding standard" than probable cause. *United States v. Lopez*,

907 F.3d 472, 479 (7th Cir. 2018). But the government must still "point to specific and

articulable facts," and not just mere "inarticulate hunches." *Terry*, 392 U.S. at 21-22.

Here, the police officers went into the liquor store and searched Swinney based

on a 911 call about a man with a gun. Whether this call was enough to support

reasonable suspicion depends on both "the content of the information possessed by

police and its degree of reliability." *United States v. Adair*, 925 F.3d 931, 935 (7th Cir.

2019) (cleaned up). "In the run of cases, informant identities exist along a spectrum

of knowledge and reliability that affects the reasonableness of police action taken

pursuant to the tip. At one end of that spectrum, officers receive a tip from a known,

trusted, and reliable source. At the other end, officers receive an anonymous tip

without signs of reliability." *Lopez*, 907 F.3d at 479-80.

This case involves an anonymous tip. For an anonymous tip to serve as the

basis for reasonable suspicion, the tip must "be reliable in its assertion of *illegality*,

not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S.

266, 272 (2002) (emphasis added). In *J.L.*, for instance, the Supreme Court held that

an anonymous tip was *not* enough to create reasonable suspicion when police received

a call from an unidentified person saying only that "a young black male standing at

a particular bus stop and wearing a plaid shirt was carrying a gun." *Id*. at 268. There

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

was no audio recording of the call, nor did police know any information about the caller or how the caller purported to know that the suspect had a gun. *Id*. Nonetheless, when police arrived at the bus stop, they did see a person matching the description, and that person ended up having a gun. *Id*. As the Supreme Court explained, though, that was not enough. It was true that the caller gave an "accurate description of a subject's readily observable location and appearance," but beyond that, the tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id*. at 271-72. In short, the police should not have relied on "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." *Id*. at 271.

But that does not mean police are never allowed to act on anonymous tips. The Supreme Court has also recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *J.L.*, 529 U.S. at 270 (cleaned up). In *Navarette*, for instance, the Supreme Court held that an anonymous tip *was* sufficiently reliable where "the caller necessarily claimed eyewitness knowledge" of the alleged crime, which "lends significant support to the tip's reliability." *Navarette v. California*, 572 U.S. 393, 399 (2014). Not only that, but the call was basically "contemporaneous" with the alleged criminal activity, which the Court read to be "especially reliable." *Id*. Finally, the *Navarette* Court placed weight on the fact that the anonymous call was made using the 911 system, which "has some features that

5

allow for identifying and tracing callers, and thus provide[s] some safeguards against making false reports with immunity." *Id.* at 400.

Swinney argues that his case is more like *J.L.*, whereas the government unsurprisingly asserts that *Navarette* should control. Specifically, the only information provided by the anonymous tip was, according to Swinney, "readily observable information about clothing and potential location," and the officers also failed to "independently corroborate the information." R. 31, Def.'s Reply Br. at 5. The officers merely "acted on a general description of clothing and location without further inquiry." *Id.* The government, on the other hand, argues that the officers properly relied on a contemporaneous eyewitness call made through the 911 system, like in *Navarette.* R. 30, Gov't Resp. Br. at 8. Moreover, says the government, "the responding officers knew that the intersection of 79th Street and Halsted Street was in a high-crime area, and knew that the reported conduct was inconsistent with the lawful possession of a gun." *Id.* at 11.

The answer is somewhere in the middle, but ultimately favors the government's view. It is a close call, but the anonymous tip in this case contained just enough indicia of reliability to support a finding of reasonable suspicion. For one, the 911 call here is far more detailed than the "bare-bones tip" in *J.L. Navarette*, 572 U.S. at 398. In *J.L.*, the caller merely said that a person of the defendant's description possessed a gun at a specific location, but did not otherwise explain *how* the caller knew about the gun or provide any indication that he had "special familiarity" with the case. *Id.* Nor did the tip include any "predictions of future behavior that could be

6

corroborated to assess the tipster's credibility." *Id*. So, if the anonymous caller in this case had simply reported that there was a man in a black coat and hat with a gun at the corner of 79th and Halsted and hung up, then that by itself might not have been enough to justify reasonable suspicion under *J.L.* But that is not what happened here.

Here the caller also provided additional details lending credibility to the tip. This call was much more than just a bare-bones description of appearance and location. Rather, the caller described Swinney's entire outfit, down to the fur trim on his coat, and also provided a play-by-play narrative account of his actions and movements, not just a static location, over the course of one-and-a-half minutes. *See United States v. Harris*, 585 F.3d 394, 401 (7th Cir. 2009) (courts should consider "the degree of detail provided by the informant"). To be clear, it is important to identify exactly what information was actually relayed to the police. According to the government, the responding officers noticed Swinney because his "blue jeans, white gym shoes, black skullcap, and dark coat with a fur-trimmed hood neatly fit those of the man described by the 911 caller." Gov't Resp. Br. at 4. The problem, though, is that the dispatcher actually omitted the details about the blue jeans and white shoes in the radio report, and only described the suspect as wearing a black skullcap and black coat with fur.[5] As far as the Court can tell, the government does not invoke the

---

[5]Another problem is that the original caller did not say anything about race, but the dispatcher unfortunately identified the suspect as "male black." *See* Dispatch Recording at 0:06. That was a mistake. But the mistaken racial identifier was not necessary to meet the reasonable-suspicion standard here. Indeed, perhaps the officers' pat-down of Swinney could have been premised on the operator's mistake, if it were objectively reasonable to do so. *See United States v. Hicks*, 531 F.3d 555, 560 (7th Cir. 2008) ("The reasonableness of the seizure turns on what the officer knew, not whether he knew the truth or whether he should have known more.") (cleaned up); *Williams v. City of Champaign*, 524 F.3d 826, 828 (7th Cir. 2008)

collective knowledge doctrine, "under which, when officers are in communication, the knowledge of one officer is imputed to the other." *United States v. Hicks*, 531 F.3d 555, 560 (7th Cir. 2008). (Nor is it clear that the doctrine applies to these circumstances.) So the government cannot now rely on the blue jeans and white shoes because those details were not actually communicated by the dispatcher to the responding officers. Even so, the description of the suspect as wearing a black skullcap and a black coat with fur was still sufficiently detailed to distinguish this tip from the one in *J.L.* or even from a more general, broadly encompassing description like "he is wearing dark clothes."

More importantly, the caller also made clear that she was personally watching the events unfold in *real time*. For more than a minute, she described in detail how there was a man who pulled out a "huge," "silver" gun out of his pocket, and then she narrated how he was standing on the corner near JJ's Fish, how he began to cross the street in the direction of the liquor store, and then how he actually went into the liquor store with the gun in his right pocket. *See* 911 Recording at 0:40-0:44, 0:50-0:53. The caller also spelled out the name of the liquor store multiple times, as if she were looking at the sign and reading it to the 911 operator. *Id*. at 1:16-1:30. This sense of contemporaneousness and urgency was relayed to the responding officers as well: the dispatcher broadcasted that the suspect "*just* pulled a large gun from his pocket" and "*just* walked into the Aida Liquor Store." Dispatch Recording at 0:09-0:12

---

(security guard's mistake in making faulty report of robbery "cannot be pasted on to the police officers" who responded to report). But the Court need not decide this issue. What matters in the here and now is that the race of the suspect is not necessary to surmount the reasonable-suspicion burden.

(emphasis added). Of course, there is always the risk that the caller fabricated the entire sequence of events. But the odds of that were severely lessened by the level of detail and the fact that the description was narrated as a contemporaneous eyewitness story. *See Navarette*, 572 U.S. at 399-400 (invoking evidence-law principles to illustrate that "statements about an event and made soon after perceiving that event are especially trustworthy because substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation") (cleaned up). This enhancement of reliability is the same principle that supports the present-sense impression exception to the rule against hearsay. Fed. R. Evid. 803(1). It takes a particularly devious tipster to make-up facts as she is watching and reporting on them live. In other words, all of the contemporaneous details provided by the caller increase the odds that the caller was telling the truth about seeing the man actually walk by JJ's Fish, cross the street, and enter Aida Liquor Store, which in turn increases the odds that the caller was telling the truth about seeing the man pull out a gun.

There is also the argument that the call was more reliable than the *J.L.* tip because it went through the 911 system. Again, Swinney does not dispute that Chicago's 911 system generally captures the phone number of incoming calls. That generally well-known feature of the system increases the reliability of even anonymous tips made through the system. *Navarette*, 572 U.S. at 399. The Court hastens to add that Swinney's concern is well taken: if this point is pushed too far, then almost all anonymous 911 calls will be deemed reliable enough for reasonable

9

suspicion. Def.'s Reply Br. at 7. But here, the 911 system is just one fact that the Court is considering along with the other characteristics of the call. It is very likely that if the tip here was simply the one from *J.L.* ("there is a man in a plaid shirt with a gun at this location"), then the fact that it was made via 911 would not have been enough to satisfy the reasonable-suspicion standard. What's more, there are other details about the caller that lend support to her reliability. For instance, even though the caller did not provide her name, she did disclose her location at the Bank of America on 79th Street and Halsted, which added credibility to her description of what she was seeing on that very same corner. (And for what it is worth, this is not a situation where she was asked for her name and deliberately chose to remain anonymous.) Similarly, there is no suggestion that the cellphone number recorded by the 911 system did not belong to her; the caller here did not, for instance, borrow someone else's phone to call 911. *See Watson*, 900 F.3d at 895 ("But here, the caller borrowed a stranger's phone, limiting the usefulness of the system's tracing ability.").

Of course, even if the caller was reliable, the content of the tip still needs to generate "reasonable suspicion that criminal activity may be afoot." *Navarette*, 572 U.S. at 401. "A call to police is less likely to support reasonable suspicion in the *Terry* analysis when it does not describe an ongoing crime or emergency." *United States v. Howell*, — F.3d —, 2020 WL 2107934, at *7 (7th Cir. May 4, 2020). Here, that standard has also been met. Of course, an anonymous tip does not become automatically actionable just because it mentions guns. Context still matters. For instance, the report of guns in public does not necessarily suggest criminal activity

10

and can be perfectly legal in certain cases. *See Watson*, 900 F.3d at 896 (explaining that gun possession was legal under Indiana law). And the tip in *J.L.*, of course, was also insufficient even though it mentioned public gun possession.

But this case goes beyond just general gun possession. Rather, the anonymous caller detailed how Swinney brought the gun into a *liquor store*. Under Illinois law, that precise conduct is illegal. *See* 720 ILCS 5/24-1(a)(8) (prohibiting carrying or possessing a firearm "in any place which is licensed to sell intoxicating beverages"). Moreover, the government points out that the gun possession laws in Illinois are much stricter than those in Indiana, where *Watson* took place. Gov't Resp. Br. at 11. Specifically, under Illinois law, even if Swinney had possessed a concealed carry permit (which Swinney does not argue that he did), it would have been illegal for him to brandish the gun on a public sidewalk. *See* 430 ILCS 66/5 (defining "concealed firearm" as "a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view of the public or on or about a person within a vehicle"). Thus, there is no question that the conduct identified in the 911 call amounted to "criminal activity [that] may be afoot." *Terry*, 392 U.S. at 30.

Swinney argues, though, that the police officers should have performed some independent corroboration of the anonymous call before searching him. Def.'s Reply Br. at 2. In general, Swinney is correct that an independent investigation can make an anonymous tip more reliable. For instance, the Seventh Circuit has explained that "[w]hen officers know the bare identity but little else about an informant, they still must conduct and rely upon independent investigation to corroborate a tip before

11

seizing a person." *Lopez*, 907 F.3d at 481. And here, it is true that the officers did not really conduct much of an independent investigation before searching Swinney.

The government, for its part, claims that the "responding officers, based on their training and experience, recognized the area near 79th Street and Halsted Street as a high crime area." Gov't Resp. Br. at 15. This argument is unpersuasive. It is true that the prevalence of specific types of crimes in an area can be relevant. *See Illinois v. Wardlaw*, 528 U.S. 119, 125 (2000) (officers specifically knew that the area was a high drug-trafficking area and then saw suspect holding an opaque bag and running away). But in this case, the government's conclusory assertion that the officers, "based on their training and experience, recognized the area near 79th Street and Halsted Street as a high crime area," is much too vague to be probative. Does "high-crime" mean night-time burglaries, car thefts, drugs, gun possession or shootings, or all or some of the above? Here, the government failed to provide any "specific and articulable facts," *Terry*, 392 U.S. at 21, to link the details in the tip (about a man brandishing a gun near a liquor store in daylight) with the claim that the intersection was a "high crime area."

That being said, the fact that the police in this case did not undertake a formal independent investigation of the claims in the 911 tip is not disqualifying. The Seventh Circuit has traditionally given more leeway to police reliance on anonymous 911 calls where the call "reported an ongoing emergency." *United States v. Williams*, 731 F.3d 678, 685 (7th Cir. 2013); *see also United States v. Wooden*, 551 F.3d 647, 650 (7th Cir. 2008) ("A 911 system designed to provide an emergency response to

telephonic tips could not operate if the police had to verify the identity of all callers and test their claim to have seen crimes in progress."). That is, "a need for dispatch can make reasonable a stop that would not be reasonable if the police had time to investigate at leisure," especially where the caller actually provided a basis for knowing about the crime. *Wooden*, 551 F.3d at 650. Here, the 911 caller stated that she was personally "watching" a man pull a "huge" gun out of his pocket on a public sidewalk, and then (after putting the gun back into the pocket) walk into a liquor store with that gun. Not only were both of those actions illegal under Illinois law (as explained above), but they gave rise to the reasonable inference that the suspect posed an urgent danger. *See also United States v. Burgess*, 759 F.3d 708, 711 (7th Cir. 2014) (noting that "the dangerousness of the crime" is a factor in the reasonable suspicion analysis). This is different from a case like *Howell*, for instance, where the tip was about someone climbing a fence. *Howell*, 2020 WL 2107934, at \*6 ("Nothing about it suggested that an emergency was underway or that anybody was in imminent danger. Not a word was said about weapons…"). Courts have repeatedly held that the brandishing of guns in public places constitutes an ongoing emergency for purposes of the reasonable suspicion analysis. *See Wooden*, 551 F.3d at 650 (noting that "a man who pulls a gun on his wife or girlfriend may do it again at any moment"); *United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006) (eyewitness report of suspect pulling gun on someone constituted "immediate threat to public safety"); *Carr v. Jehl*, 2015 WL 362089, at \*5 (N.D. Ill. Jan. 28, 2015) (911 report that man pulled a gun in a garage constituted "perceived emergency situation"). Here, the contemporaneous,

13

eyewitness, play-by-play account of a man pulling out a large gun, then putting it back into his pocket, and seconds later walking into a liquor store did not leave the responding officers with "time to investigate at leisure." *Wooden*, 551 F.3d at 650.

Moreover, it is worth noting that the officers' observations in this case never contradicted the details in the tip. *See Lopez*, 907 F.3d at 483 (informant tip was not reliable where officers' observations of suspect did not at all match details provided by informant); *Howell*, 2020 WL 2107934, at \*6 (anonymous tip was not reliable where "the call mentioned a bag, which Howell did not have, and described Howell, who is white, as appearing Hispanic"). Here, the officers only stopped Swinney after they walked past at least three other customers *not* wearing a black skullcap and black coat with fur. Swinney, on the other hand, *was* wearing a black skullcap and a black coat with fur trim along the hood, and he also happened to be standing inside the exact store identified by the caller merely minutes before. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) ("[P]olice observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch."). It is true, as Swinney points out, that the gun was not visible by that point. Mot. Suppress at 5. But as the government points out, the mere "absence of additional suspicious conduct" should not necessarily negate the officers' reasonable suspicion that Swinney was carrying a gun in a liquor store. Gov't Resp. Br. at 13 (citing *Wooden*, 551 F.3d at 650). After all, the dispatch report relayed to the officers merely said that the suspect was a "person with a gun."

14

Dispatch Recording at 0:15. Even though the gun had been pulled out before the suspect entered the liquor store, there is no reason why he could not have placed the gun back into his pocket, particularly once the responding officers entered the store.[6] *See Navarette*, 572 U.S. at 411 (tip was reliable even where officers tailed the suspect car for five minutes without observing any sort of reckless driving) (Scalia, J., dissenting); *Wooden*, 551 F.3d at 650 (tip was reliable even where "couple was chatting amicably by the time the police arrived").

Under the totality of the circumstances, the Court concludes that the caller's contemporaneous eyewitness report, the ostensible emergency situation involving the possession of a gun in a liquor store, the use of the recorded and traceable 911 system, and the responding officers' observation of Swinney wearing the exact articles of clothing described by the caller (a black skullcap and black coat with fur trim) in the exact location described by the caller (Aida Liquor Store at 79th and Halsted) merely minutes after the call was made—all taken together—gave the officers reasonable suspicion to believe that Swinney was carrying a gun. Thus, the pat-down search of Swinney was justified by reasonable suspicion.

### III. Conclusion

For the reasons explained above, the motion to suppress is denied. The status hearing of June 16, 2020 remains in place for now. But the parties shall file a written

---

[6]Indeed, the actual 911 call was even more detailed, stating that the man walked into the store with his hand in his right pocket to his coat with a gun in it. 911 Recording at 1:03-1:09. But of course, the dispatcher did not relay that specific fact—that the suspect's gun was in his right pocket—to the responding officers.

status report on the next step of the case by June 12, 2020, in order to avoid an

unnecessary in-court appearance.

ENTERED:


      s/Edmond E. Chang

Honorable Edmond E. Chang

United States District Judge


DATE: May 30, 2020